**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

------------------------------------------------------ :
PAUL W. GEHRT,                                         :
                                                      : Cause No. 01 MDL 875
                           Plaintiff,                 :
                                                      : Case No. 08-CV-92066
        v.                                            :
                                                      : Trans. from IL-CD Case No. 96-2071
A.W. CHESTERTON COMPANY, *et al.*,                    :
                                                      :
                           Defendants.                :
------------------------------------------------------ :
                                                      :
                                                      :

### <u>NOTICE OF FILING</u>

         PLEASE TAKE NOTICE that on July 15, 2011 I caused to be filed electronically with

the Clerk for the United States District Court for the Eastern District of Pennsylvania, Owens-

Illinois, Inc.'s Rule 26 Disclosures and Designations of Prior Testimony.


DATED: July 15, 2011

                                          s/ Edward Casmere
                                          Robert H. Riley
                                          Matthew J. Fischer
                                          Edward Casmere
                                          Attorney for Defendant
                                          OWENS-ILLINOIS, INC.

Schiff Hardin LLP
233 South Wacker Drive
Chicago, Illinois 60606
(312) 258-5500
(312) 258-5600 (*facsimile*)

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

```
------------------------------------------------   :
PAUL W. GEHRT,                                     :
                                                   :   Cause No. 01 MDL 875
                        Plaintiff,                 :
                                                   :   Case No. 08-CV-92066
        v.                                         :
                                                   :   Trans. from IL-CD Case No. 96-2071
A.W. CHESTERTON COMPANY, et al.,                   :
                                                   :
                        Defendants.                :
------------------------------------------------   :
                                                   :
                                                   :
```

**OWENS-ILLINOIS, INC.'S RULE 26 DISCLOSURES AND DESIGNATIONS OF
PRIOR TESTIMONY**

Defendant Owens-Illinois, Inc. ("Owens-Illinois") discloses the following witnesses who may testify at trial by deposition or live testimony, and preserves its objections to Plaintiff's(s') designations of prior testimony. Owens-Illinois may amend these disclosures in accordance with Federal Rule 26 and Judge Strawbridge's June 9, 2011 Scheduling Order:

## I.    Rule 26 (a) (1) Witnesses:

The following witnesses may be called to provide fact or lay opinion testimony regarding Owens-Illinois and the products manufactured thereby, including, but not limited to, what products were manufactured and sold by Owens-Illinois, in what manner and for what time period, and the extent of the asbestos content, if any. The following witnesses may also testify regarding the product exposure of the Plaintiff(s) and/or Plaintiff's(s') decedent.

**1.**    Co-workers/site witness of the Plaintiff's(s') and/or Plaintiff's(s') decedent's worksite.

**2.**    Former Owens-Illinois employees.

**a.    Willis G. Hazard (deceased)**, testimony by deposition taken February 11, 1981, Toledo, Ohio, in a number of cases and jurisdictions (deposition has been previously provided to counsel, and is otherwise available upon request). <u>See</u>

designations attached hereto as Exhibit A. Mr. Hazard worked as an industrial hygienist at Owens-Illinois from 1934 through 1942 and 1946 through 1974. Mr. Hazard's testimony thus provides valuable historical perspective with respect to the years that Owens-Illinois was developing Kaylo, an asbestos-containing insulation product manufactured by Owens-Illinois in the 1940s and 1950s. In addition, Mr. Hazard's deposition includes testimony regarding certain of the so-called "Saranac Lake" documents that may be used at the trial. Mr. Hazard died on October 29, 1993, and therefore is unable to testify live at trial.

      **b.**     **Richard E. Grimmie,** by prior trial testimony. Mr. Grimmie is uniquely qualified to testify with respect to the conditions at the Owens-Illinois plant in Berlin, New Jersey, where Kaylo was manufactured, as demonstrated by his trial testimony in the McLean County case of <u>McClure v. Illinois Central Railroad</u>, 94 L 107. Mr. Grimmie began working at the Berlin plant in the late 1940s as an hourly employee and then became the personnel manager (testimony has been previously provided to counsel, and is otherwise available upon request). <u>See</u> designations attached hereto as Exhibit A. In that capacity, he established safety programs and supervised the plant nurse. Much of his work was related to Owens-Illinois's programs and policies on dust control and respirator use.

      **c.**     A custodian of records to discuss the absence of invoices of shipment(s) of products (which are the subject of the litigation) manufactured and/or sold by Owens-Illinois to any other entity.

      **d.**     A custodian of records to discuss the absence or presence of employment records relating to the Plaintiff(s) and/or Plaintiff's(s') decedent.

      **e.**     Representatives of co-defendants (live or by deposition).

    **3.**     Representatives of any of the Plaintiff's(s') and/or Plaintiff's(s') decedent's employers.

    **4.**     Representatives of companies who supplied or sold products to any of the Plaintiff's(s') and/or Plaintiff's(s') decedent's employers.

    **5.**     Former Insulators/Asbestos Workers (by deposition) to discuss the use non-Kaylo asbestos containing products at Plaintiff's(s') and/or Plaintiff's(s') decedent's worksites.

    **6.**     Any Rule 26 witness named by any other party.

    **7.**     Any treating or diagnosing physician who treated or who has been identified by the Plaintiff(s), or any other defendant.

## II.    <u>Rule 26 (a) (2) Witnesses:</u>

The following witnesses may be called pursuant to Rule 26 (a) (2):

**State of the Art Witnesses:**

Each state of the art witness below will testify regarding the development of knowledge regarding the potential health hazards of asbestos including the materials published in the literature and the significance of each within the context of the time it was published, the ACGIH's MAC/TLV or "safe level" of exposure to asbestos, the understanding of the exposures to finished insulation products sustained by workers in the field and the significance of those exposures in the context of the time they were published, and the general significance of publications about asbestos and any potential health hazards. Each witness may testify generally about the process by which medical knowledge evolved concerning exposure to asbestos and asbestos-containing products. They may testify concerning the historical "state of the art" regarding asbestos-related disease. Their testimony may include reference to both the published scientific and medical literature concerning asbestos and the so-called "Saranac" documents regarding Owens-Illinois Kaylo. In addition, they may offer testimony in response to the Plaintiff's(s') and/or Plaintiff's(s') decedent's allegation, if any, that there was a "conspiracy" among certain miners, manufacturers and sellers of asbestos and asbestos-containing products.

The gist of the testimony offered by these individuals will be that Owens-Illinois acted exemplarily in the context of the time; its conduct was reasonable based on the knowledge and information available at the time; it operated its Kaylo facilities within what was contemporaneously believed to be safe levels of exposure to asbestos and asbestos dust; that Owens-Illinois informed its work force that asbestos was potentially hazardous; that Owens-Illinois took substantial measures to minimize the amount of dust to which its employees were exposed; the scientific and medical literature at the time supported the conclusion that Kaylo was safe to make and use; that there was a "safe level" of exposure to asbestos and during the time Owens-Illinois was involved in the manufacture and sale of Kaylo it was established and believed that end users of products like Kaylo were not exposed above the "safe level"; and that it was reasonable, within the historical, scientific, and medical, context of the time, for Owens-Illinois to have manufactured its Kaylo product, and to sell that product without a warning relating to asbestos. These witnesses will also place all of Owens-Illinois's conduct within the proper historical, scientific, and medical, context of the time involved in these cases. Each witness may also discuss the history, career, and qualifications of Willis Hazard and Philip Drinker and the contributions each made to the developing the field of industrial hygiene. The testimony offered will also include the fact that no evidence of any agreement involving Owens-Illinois to suppress or misrepresent the health effect of asbestos is known to these witnesses. These witnesses may, discuss the asbestos content of Owens-Illinois Kaylo at any relevant time and how that product would react to various environmental conditions such as exposure to water. Further disclosure, to the extent appropriate is provided below:

1.    **Peter Neushul, Ph.D.**; Visiting Researcher, Department of History University of California, Santa Barbara, CA 93106.

See the general state-of-the-art description above.

Peter Neushul, Ph.D. is a historian, engaged in teaching and consulting work in the History of Science, Technology and Medicine. Dr. Neushul is expected to testify concerning the state-of-the-art as it applies to medical and scientific knowledge relating to asbestos

and the health effects of exposure to asbestos, the history of science and technology and the cultural history of the United States as applicable to this case. He will address the development of knowledge with regard to the risks associated with remote exposures to asbestos, including but not limited to the development of knowledge regarding the transportation of work clothes and/or asbestos from a workplace to some other location. He will focus specifically on the state-of-the-art in the 1940s, 1950s, and 1960s, but will also address relevant developments before and after that period of time as necessary to explain his opinions. He will place the development of asbestos-related knowledge in context with the development of other areas of scientific, medical and technical knowledge during that same time period. He will also testify regarding the dissemination of information relating to the health effects of exposure to asbestos.

Peter Neushul may also have investigated the certain deposition testimony, the specific sites at issue in these lawsuits, as well as other locations where the Plaintiff(s) and/or Plaintiff's(s') decedent may have been exposed to asbestos. He has developed opinions regarding the use and non-use of insulation products at the sites described. He has also developed opinions regarding how those products were likely used, based on the available literature regarding their expected use. Additionally, Dr. Neushul is expected to testify concerning state-of-the-art, the history of science and technology applicable to these cases, and the cultural history of the United States as applicable to these cases. He also will testify about Owens-Illinois's actions in the 1940s and 1950s, including the Saranac Lake documents, among other things in the context of the medical, scientific, and regulatory state-of-the-art at the time. Dr. Neushul may testify about certain jobsites or employers identified by the Plaintiff's(s') and/or Plaintiff's(s') decedent's testimony and records, and research conducted re: those sites.

    **2.**    **Keith R. Benson, Ph.D.**; Principal, Green College, 6201 Cecil Green Park Road; Vancouver, BC V6T1Z1, Canada.

    <u>See</u> the general state-of-the-art description above.

Additionally, Dr. Benson is a historian of medicine and science engaged in teaching and consulting work in the history of medicine and science. He is expected to testify concerning state-of-the-art, the history of medicine and science applicable to this case, and the cultural history of the United States as applicable to this case. He is also expected to testify regarding Owens-Illinois, Inc.'s actions in the 1940s and 1950s, including, among other things, Owens-Illinois' Saranac Lake research program.

**<u>Industrial Hygienists:</u>**

    **1.**    **Earl D. Gregory, Ph.D., CIH, CSP**, 5718 Yamasseo Dr., Hamilton, Ohio 45011.

Dr. Gregory is a certified industrial hygienist and certified safety professional. He has over 30 years experience in the area of occupational safety and health. He will be called to testify about general issues of industrial hygiene, including but not limited to asbestos exposure, exposure to other dusts and chemicals in the workplace, dust levels, and exposure levels. He may also testify about general industrial hygiene principles and methodologies used to determine whether a potential hazard to asbestos exists.

He may review certain deposition testimony and other documents exchanged in this case, as well as the published scientific and medical and industrial hygiene literature relating to the development of knowledge concerning asbestos-related health risks. In addition to his academic and professional credentials, he has over 30 years of practical experience in the field of industrial hygiene, including the recognition, monitoring and control of occupational disease and potentially hazardous exposures.

Dr. Gregory is also familiar with the characteristics, uses, and limitations of a variety of asbestos-containing products, including without limitation insulation materials. He has analyzed the deposition testimony in light of that knowledge and has reached conclusions regarding the Plaintiff's(s') and/or Plaintiff's(s') decedent's likelihood of occupational exposure to asbestos during the course of his/her work.

Dr. Gregory is familiar with the industrial hygiene principles that apply when evaluating the scope of an asbestos risk and whether a risk is presented to persons who are remote from the source of the potential hazard. Mr. Gregory may testify about the significance (from an industrial hygiene perspective), or lack thereof, of asbestos exposures the Plaintiff(s) and/or Plaintiff's(s') decedent may have had (or claims to have sustained) to various different products and types of fibers. In cases with sufficient information he will testify about the cumulative lifetime exposure dose and the significance, if any, any Owens-Illinois Kaylo exposure to that dose. He may discuss the asbestos content of Owens-Illinois Kaylo at any relevant time to this case and how that product would react to various environmental conditions such as exposure to water. Dr. Gregory may also testify about the effect of distance, and other environmental conditions, on the concentration of asbestos from insulation products to which the Plaintiff(s) and/or Plaintiff's(s') decedent may have sustained.

Dr. Gregory is also expert with regard to regulations that apply to asbestos and asbestos-containing materials and may offer testimony regarding those regulations.

**2.     William Dyson, Ph.D.,** Workplace Environments, LLC, P. O. Box 49176 Greensboro, NC 27419.

Dr. Dyson is an industrial hygienist. Dr. Dyson may testify about industrial hygiene and threshold limit values, product testing, emissions, development of knowledge regarding asbestos exposure, product warnings, and/or dust counting equipment and techniques. Dr. Dyson may discuss the relationship between scientific knowledge and the development of public policy and standards relating to asbestos exposure, and all aspects of government regulation of asbestos release and exposure. Dr. Dyson may also testify about the development of knowledge regarding the dose-response relationship between exposure to asbestos and disease, and other related matters.

Dr. Dyson is expected to testify about the general principles of industrial hygiene and the factors that are important to industrial hygiene studies. Dr. Dyson may testify about the historical studies and regulations regarding asbestos and industrial hygiene. He is expected to testify as to the manner in which experts can use industrial hygiene data and how the data should be interpreted in specific cases. Dr. Dyson is expected to testify as to the manner in which industrial hygiene data should be considered in evaluating exposures.

Dr. Dyson may also testify regarding industrial hygiene conditions where the facilities where the Plaintiff(s) and/or Plaintiff's(s') decedent worked to the extent they were exposed to asbestos at such locations. Dr. Dyson may testify about the insignificance of the Plaintiff's(s') and/or Plaintiff's(s') decedent's alleged exposures to this defendant's product insofar is it relates to causation of the Plaintiff's(s') and/or Plaintiff's(s') decedent's alleged asbestos-related disease. In cases with sufficient information he will testify about the cumulative lifetime exposure dose and the significance, if any, any Owens-Illinois Kaylo exposure to that dose. Additionally, Dr. Dyson may testify consistent with his affidavit and report titled "Visibility of Asbestos Dust." He may discuss the asbestos content of Owens-Illinois Kaylo at any relevant time to this case and how that product would react to various environmental conditions such as exposure to water. Dr. Dyson may also testify about the effect of distance, and other environmental conditions, on the concentration of asbestos from insulation products to which the Plaintiff(s) and/or Plaintiff's(s') decedent may have sustained.

**Medical Physicians:**

Each general medical physician below may be expected to testify, in general, concerning asbestos-related diseases, the effects of exposure to asbestos upon a person or persons in general, including the epidemiology of asbestos-related diseases, and the link between use of tobacco products and various pulmonary and other diseases and conditions.

In addition, these physicians may testify about the necessary elements of a clinical diagnosis of asbestos-related disease, the complexities and scientific criteria associated with determination of cause-effect relationships between occupational exposures and lung or other pathology, the nature of various diseases and conditions, and the likelihood that such diseases or conditions will progress, recur, or predispose an individual to develop another related disease or condition.

Each physician below may testify concerning their diagnosis of the medical condition of the Plaintiff(s) and/or Plaintiff's(s') decedent and whether his medical condition was caused by exposure to asbestos. Their testimony may also include their interpretation of the Plaintiff's(s') and/or Plaintiff's(s') decedent's x-ray films, pathology material and other medical records and diagnostic tests; the presence of other abnormalities or conditions unrelated to an exposure to asbestos; and epidemiological, radiological and general medical issues pertinent to the Plaintiff's(s') and/or Plaintiff's(s') decedent's condition.

These physicians may be expected to testify to the diagnosis of the Plaintiff's(s') and/or Plaintiff's(s') decedent's alleged medical condition, the effects of cigarette smoking, and whether the Plaintiff(s) and/or Plaintiff's(s') decedent had a condition or illness associated with, or caused by, asbestos exposure. These witnesses may also testify about carcinogenesis, the significance or insignificance of the Plaintiff's(s') and/or Plaintiff's(s') decedent's alleged exposures to an Owens-Illinois product, whether there is a medical cause of the Plaintiff's(s') and/or Plaintiff's(s') decedent's condition, whether there is a sole proximate cause (or sole cause), and whether any alleged exposure to an Owens-Illinois product was/was not a substantial contributing factor in causing the Plaintiff's(s') and/or Plaintiff's(s') decedent's alleged condition.

In addition, these physicians may testify about the necessary elements of a clinical diagnosis of asbestos-related disease, the criteria associated with determining causal relationships between possible asbestos exposure and lung pathology, and the nature of various diseases and conditions. Further disclosure, to the extent appropriate is provided below:

  **1.**  **Allan Feingold, M.D.**; South Miami Hospital; 6200 South West 73rd Street; Miami, Florida 33143.

  <u>See</u> the general medical physician description above.

  Dr. Feingold is a specialist in pulmonary medicine and a NIOSH certified "B-reader". Dr. Feingold may testify about his examination of the Plaintiff(s) and/or Plaintiff's(s') decedent and/or review of the Plaintiff's(s') and/or Plaintiff's(s') decedent's medical records and x-rays and may offer opinions regarding whether or not the Plaintiff(s) and/or Plaintiff's(s') decedent has an asbestos-related disease. Dr. Feingold may also testify concerning the criteria used to diagnose asbestos-related diseases and prognosis regarding any alleged medical conditions. Dr. Feingold may also testify about general medical issues and the effects that asbestos and other substances have on human health generally and specifically with respect to the Plaintiff(s) and/or Plaintiff's(s') decedent.

  Dr. Feingold may testify about general and asbestos-related pulmonary medicine and epidemiology relevant thereto. He is expected to testify about pulmonary medicine and diseases in general, including smoking-related diseases and asbestos-related diseases. He may also testify regarding the Plaintiff's(s') and/or Plaintiff's(s') decedent's alleged medical conditions based on review of medical records, x-rays and the Plaintiff's(s') and/or Plaintiff's(s') decedent's expert reports. Additionally, he may testify about the relative pathogenicity of various forms of asbestos fibers, particularly chrysotile, concerning their propensity to cause mesothelioma.

  Dr. Feingold will also testify as to the idiopathic nature of mesothelioma in some individuals. He will also testify that certain other cancers are not in reasonable medical probability related to asbestos exposure based upon the scientific evidence. These will include laryngeal and colon rectal cancers, among others.

  Dr. Feingold may testify concerning the nature and extent of medical and scientific knowledge as it has existed from time to time regarding the association of pulmonary disease with asbestos exposure based upon the medical and scientific literature. Based on that literature's development over time, he will testify on the perceptions of which populations and workers were at risk of asbestos disease. He will also testify concerning diagnostic methods, and the incidence of lung cancer among individuals with asbestosis as compared to non-asbestotic workers and to the general public. He will also testify to smoking and its relation to cancer of the lung and cancer of other parts of the body. He will further testify concerning the lack of relationship between the presence of pleural plaques and later development of any form of cancer and the necessity for an underlying diagnosis for pulmonary asbestosis in order to attribute lung cancer to asbestos exposure. Dr. Feingold may offer testimony in response to any reports or testimony offered by the Plaintiff's(s') experts.

**2.**     **Joseph J. Renn, III, M.D.,** F.C.C.P., B.C.F.E., B.C.F.M., 439 Buckeye Road, Core, WV 26541.

Dr. Renn is a certified NIOSH B-reader. Dr. Renn may testify concerning the anatomy and function of the respiratory and circulatory system, the nature of asbestos, the disease process and diagnosis of asbestos and cancer associated with the respiratory system, the nature and extent of medical and scientific knowledge regarding the association of pulmonary disease with asbestos fiber exposure, the effect of exposure to substances other than asbestos on the development or manifestation of obstructive and restrictive conditions and diseases particularly in means of establishing the differential diagnosis of alleged asbestos diseases with other government warnings, smoking and other areas of the state-of-the-art, incidents of lung cancer among individuals with asbestosis compared with non-asbestos exposed workers and with the general population, and cigarette smoking and its effects on the lungs. Dr. Renn may testify concerning the examination and diagnosis of the physical condition of the Plaintiff(s) and/or Plaintiff's(s') decedent and concerning the overall condition and relationship of that condition, if any, to the Plaintiff's(s') and/or Plaintiff's(s') decedent's alleged exposure to asbestos. He may also testify about the Plaintiff's(s') and/or Plaintiff's(s') decedent's prognosis or current condition as well as the Plaintiff's(s') and/or Plaintiff's(s') decedent's clinical presentation.

Dr. Renn will testify concerning state of the scientific and medical art in the history and knowledge of asbestos-related diseases and asbestos-related diseases in general, and the medical condition of the Plaintiff(s) and/or Plaintiff's(s') decedent, epidemiology and general medicine regarding asbestos exposure. He may also provide opinions on the probable time period(s) of asbestos exposure with relation to the causation of the disease mesothelioma. In doing so, he will also provide percentages of probability of causation for exposure to asbestos from first exposure to last exposure. As a basis for opinion, he will rely in part upon scientific papers published by Peto, Seidman and Selikoff, Morgan and Lampshear, among others. Dr. Renn may also testify regarding the state of scientific and medical knowledge during the time asbestos was used commercially in high temperature insulation products. Dr. Renn will testify about his review of the medical records and other reports in this case. He will discuss Mr. Steineke's condition and his condition after the surgeries and treatments for his mesothelioma. He may testify regarding cause of medical condition and whether the extent to which the Plaintiff's(s') and/or Plaintiff's(s') decedent's particular exposures to asbestos-containing materials caused his/her injury.

**3.**     **Lawrence N. Weiss, M.D.,** Division of Pathology, City of Hope National Medical Center, 1500 E. Duarte Drive, Duarte, CA 91010.

Dr. Weiss is Chairman of Pathology at City of Hope National Medical Center. He received his bachelor's degree from the University of Maryland in 1976 and his medical degree from the University of Maryland School of Medicine in 1981. Dr. Weiss is expected to testify regarding the discipline of pathology in general, carcinogenesis, especially with respect to mesothelioma, the current state of scientific knowledge about the role asbestos plays in the development of a malignancy, the mechanism by which a cell becomes cancerous, and other medical topics, and the relationship of those general topics to the Plaintiff's(s') and/or Plaintiff's(s') decedent's medical condition. Dr. Weiss is not expected to testify as to his examination of any pathology material specific to the Plaintiff(s) and/or Plaintiff's(s') decedent, but may testify in response to opinions of pathologists who have

examined the Plaintiff's(s') and/or Plaintiff's(s') decedent's tissue. Dr. Weiss will also testify that mesothelioma, like cancer generally, begins in a single cell. To form a cancer, that single cell must, over time, acquire six properties: Self-sufficiency of growth signals; Insensitivity to antigrowth signals; Ability to evade programmed cell death; Limitless replicative potential; Ability to invade local tissue, and metastasize; and Sustained angiogenesis, or the ability to form blood vessels. These properties are acquired by way of genetic changes that occur to the single cell-of-origin, or the clonal proliferation of cells it generates. Only three to about one dozen genetic changes are needed to generate a cancer. Some of the mutations may be due to factors internal to the individual involved; others may be due to external factors, such as asbestos in the case of most mesotheliomas. Whether internal or external, the damage must be done to the same cell or its progenitors. Genes do not mutate as a result of damage to distant cells. Thus, asbestos fibers which do not physically touch the one cell or its immediate neighbors do not contribute to the cancer. Only a small number of fibers actually cause the cancer. The accumulation of fibers over time does not contribute to the cancer, expect for the few fibers which may accumulate at the site of the single cell-of-origin itself. There is no respected scientific school of thought which holds that (a) fibers which do not reach the site-of-origin contribute to the cancer, or (b) that mesothelioma is cumulative in nature; i.e. that a series of exposures together contribute to cause a mesothelioma.

   4.   **Lee Sider, M.D.**; University of Medicine & Dentistry of New Jersey; 150 Bergen St. C-320; Newark, New Jersey 07103.

   Dr. Sider will offer testimony regarding the following: medical literature relating to medical conditions and asbestos; causes of medical conditions reported by the Plaintiff(s) and/or Plaintiff's(s') decedent; the Plaintiff's(s') and/or Plaintiff's(s') decedent's condition and its cause from a review of medical records, slides, tests, and other materials and information, and from examination of the Plaintiff(s) and/or Plaintiff's(s') decedent, to the extent undertaken. Dr. Sider will testify about his review of the medical records/chest films in this case, and is expected to testify consistent with the opinions disclosed in his report that has been produced. In addition, Dr. Sider is expected to testify regarding the following matters and areas:

   a.   the nature of asbestosis,

   b.   the nature and extent of medical and scientific knowledge regarding any association between certain medical conditions and asbestos exposure;

   c.   the state of scientific and medical knowledge over time regarding asbestos;

   d.   the history, evolution, and knowledge of asbestos and disease;

   e.   handling of asbestos products, cigarette smoking, and other causes of conditions which allegedly affect the Plaintiff(s) and/or Plaintiff's(s') decedent;

**f.**     lack of exposure, *de minimis* or low-dose exposure, and in particular, lack of exposure causing the Plaintiff's(s') and/or Plaintiff's(s') decedent's condition;

**g.**     causation or lack thereof of the alleged condition of the Plaintiff(s) and/or Plaintiff's(s') decedent due to exposure to particular product(s);

**h.**     medical literature relating to different medical conditions and asbestos, including the Plaintiff's(s') and/or Plaintiff's(s') decedent's alleged medical condition;

**i.**     the Plaintiff's(s') and/or Plaintiff's(s') decedent's medical condition, its diagnosis, its nature, its seriousness, its cause, and its treatment and prognosis from a review of medical records, radiology materials, pathology slides, tests, and other materials and information, and from examination of the Plaintiff(s) and/or Plaintiff's(s') decedent, to the extent undertaken; and

**j.**     whether or the extent to which a particular product did or did not contain asbestos.

　　　　**5.**     **Peter Barrett**, M.D., clinical Professor of Radiology, Tufts University School of Medicine, 300 Boylston Street, Suite 714, Boston, MA 02116, (617) 426-2110

　　　　Dr. Peter Barrett is a practicing radiologist, B-reader and clinician. He may provide testimony regarding the Plaintiff's(s') and/or Plaintiff's(s') decedent's x-rays, CT-scans and other diagnostic tools so as to provide an opinion whether the Plaintiff(s) and/or Plaintiff's(s') decedent has an asbestos-related disease. He will also review the ILO classification system for chest films and its role and function in evaluating the pneumoconiosis in general, and asbestosis in particular, and may also include a review of the medical records and other clinical information regarding the Plaintiff(s) and/or Plaintiff's(s') decedent to provide an opinion as to whether the Plaintiff(s) and/or Plaintiff's(s') decedent has an asbestos-related disease.

　　　　With respect to the Plaintiff(s) and/or Plaintiff's(s') decedent, he may testify as to his review and interpretation of x-ray films, review and interpretation of pulmonary function testing, the nature and extent of any impairment or disability, whether a condition is progressive and whether other diseases or conditions are present in the Plaintiff(s) and/or Plaintiff's(s') decedent. He will testify regarding the existence or non-existence of any alleged asbestos-related disease in the Plaintiff(s) and/or Plaintiff's(s') decedent, including but not limited to pleural changes, asbestosis, lung cancer, mesothelioma, laryngeal cancer, esophageal cancer, gastrointestinal cancer, and other forms of cancer where applicable.

　　　　He will also testify on general medicine issues regarding asbestos-related diseases including, but not limited to, lung physiology, lung function, lung defense mechanisms and the mechanisms by which asbestos fibers do or do not cause a particular disease. He may also testify on increased risk of cancer issues and whether the Plaintiff(s) and/or Plaintiff's(s') decedent has a reasonable fear of cancer due to exposure to asbestos. He may also testify on the health consequences of smoking and the relationship between smoking

and alleged asbestos-related diseases, generally and with respect to the Plaintiff(s) and/or Plaintiff's(s') decedent. He will testify regarding the contributions if any, of smoking, asbestos, and other environmental or occupational or hereditary or other factors, if any, to the Plaintiff's(s') and/or Plaintiff's(s') decedent's disease. He may also testify as to whether the Plaintiff(s) and/or Plaintiff's(s') decedent suffers from other diseases or conditions unrelated to asbestos exposure, and the impact of such disease or conditions on functional impairment or disability or life expectancy.

He will further testify regarding the epidemiology of asbestos diseases, the criteria for diagnosis of asbestos-related disease, as well as the existence of a dose response relationship between exposure to asbestos and asbestos-related diseases. He may further testify regarding the differing propensity of various asbestos fiber types to contribute to mesothelioma or other asbestos-related disease. He may also testify regarding the determination of the relative risks of suffering personal injury or death as a result of exposure to asbestos-containing products sold or installed by this defendant. It is also his opinion that the non-occupationally exposed general public is not at risk for the development of an asbestos-related condition or disease, even though there is asbestos in the ambient air. Thus, because of the large dose needed to cause an asbestos-related disease, a single asbestos fiber does not contribute to disease. He may also testify regarding government regulations applicable to Defendant's products.

**6.      Michele Carbone, M.D., Ph.D.**, Professor of Pathology, Director Thoracic Oncology Program, Associate Director for Basic Services, Cancer Research Center of Hawai'i, 651 Tialo Street, Suite 231, Honolulu, Hawai'i, 96813-5534, (808) 440-4596

Dr. Carbone is a pathologist. He may testify, live or by deposition, concerning his review of the medical records, pathology and/or work history of the Plaintiff(s) and/or Plaintiff's(s') decedent, the Plaintiff's(s') and/or Plaintiff's(s') decedent's medical condition, diagnosis, and the cause of the Plaintiff's(s') and/or Plaintiff's(s') decedent's medical condition. His testimony may include his analysis of immunohistochemical stains, histochemical stains, electron microscopy, fiber burden analysis, x-18 translocation tests, genetic testing, and p-16 methylation studies. His testimony may also include discussion of asbestos and its effect on human health generally and the Plaintiff's(s') and/or Plaintiff's(s') decedent's specifically, and the effect that other substances have on human health generally and the Plaintiff's(s') and/or Plaintiff's(s') decedent's condition specifically, including the polio vaccine and the SV-40 contaminant. Dr. Carbone may also testify regarding the medical conditions of the Plaintiff(s) and/or Plaintiff's(s') decedent based on review of medical records, x-ray reports, the Plaintiff's(s') and/or Plaintiff's(s') decedent's experts' reports and supplemental reports and his training, experience and other special expertise. Further, Dr. Carbone may testify concerning the increased risk, if any, of cancer faced by asbestos exposed workers and the prognosis of such individuals. He may testify regarding cause of medical condition and whether the extent to which the Plaintiff's(s') and/or Plaintiff's(s') decedent's particular exposures to asbestos-containing materials or SV-40 caused his/her injury. He may also testify regarding the immunohistochemical staining process and results of staining performed on the Plaintiff's(s') and/or Plaintiff's(s') decedent's tissue samples, molecular studies, EM studies, as well as any fiber burden or digestion studies performed. Furthermore, Dr. Carbone may testify about the presence of the SV-40 virus in the Plaintiff's(s') and/or Plaintiff's(s') decedent's pathology specimens and results of PCR analysis. He may also testify about the many causes of cancer and

- 12 -

cancer causes in general. He may also testify about the issue of idiopathic/unknown etiology of cancer.

In addition, if called to testify, either live or by deposition, Dr. Carbone is expected to provide testimony regarding the areas stated below:

1.       the anatomy and function of the respiratory and circulatory systems, including the protective systems of the body with regards to the inhalation and retention of dust, and the diagnosis and treatment of disease affecting such systems;

2.       the nature of asbestos and asbestos-related diseases;

3.       the symptomatology, disease process and diagnosis of asbestosis and cancer associated with the respiratory system, peritoneum and peritoneal cavity;

4.       the nature and extent of medical and scientific knowledge regarding any association of obstructive pulmonary disease with asbestos fiber exposure;

5.       the effect of exposure to substances other than asbestos on the development and manifestation of obstructive and restrictive conditions and diseases of the respiratory system and other causes of obstructive and restrictive disease or defects of the respiratory system;

6.       methods of diagnosis of various diseases, especially the means of establishing the differential diagnosis of alleged asbestos-related diseases with other non-asbestos-related diseases;

7.       incidence of lung cancer among individuals with asbestosis or asbestos exposure as compared to non-asbestotic asbestos workers, non-asbestos exposed workers and to the general population;

8.       cigarette smoking and its effects on the lungs and other organs;

9.       the relationship of cigarette smoking to cancer of the lung and cancers of other body parts with reference to epidemiology studies and physiologic effect;

10.      the difference between impairment and disability;

11.      the effect of asbestosis or other asbestos-related disease, or asbestos exposure without asbestosis or other asbestos-related disease, on disability and life expectancy;

12.      the lack of relationship between the presence of pleural plaques and a later development of any form of cancer;

13.      the history of evolution and knowledge of asbestos related diseases;

14.      the import of any exhibit introduced as evidence, or any items prepared for use or used for demonstrative purposed by any witness;

**15.** cancer incidence in the general population and among asbestos workers and its potential causes, including but not limited to SV-40;

**16.** the incidence of mesothelioma among various kinds of workers exposed to asbestos, and the relative importance of various fiber types and the cause of mesothelioma; and

**17.** causation of cancer in this case, including the absence of pathologic and other evidence in this case sufficient to implicate any Owens-Illinois product as a cause or the cause of the Plaintiff's(s') and/or Plaintiff's(s') decedent's cancer;

**18.** the scientific methods to be used in attributing causation of an asbestos-related cancer to a particular exposure or series of exposures, including exposures to a particular asbestos-containing product or products;

**19.** molecular biology and causation of mesothelioma as it relates to SV-40;

**20.** DNA sequencing and testing for different forms of cancer, including mesothelioma and the SV-40;

**21.** to the extent not covered above, general medical principles and ethic, proper treatment and diagnosis of mesothelioma, asbestos medicine in general, as well as SV-40 in general.

**7.** **Dr. Elliot Kagan**, 4 Royal Oak Court, Potomac, Maryland 20854-2654

Dr. Kagan, if called to testify, is expected to provide testimony concerning the anatomy and function of the respiratory and circulatory systems; examinations conducted and opinions regarding tissue samples of decedents; the symptomatology, disease process and diagnosis of asbestosis and cancer of the respiratory system, peritoneum and peritoneal cavity; the nature and extent of medical and scientific knowledge regarding any association of pulmonary disease with asbestos fiber and the effect of exposure to substances other than asbestos in the development and manifestation of diseases of the respiratory system; the methods of diagnosis and means of establishing the differential diagnosis of asbestos-related diseases with non-asbestos related diseases; the incidence of lung cancer in the general population and those individuals exposed to asbestos; cigarette smoking and its effects on the lungs; the difference between impairment and disability; the effect of asbestosis on disability and life expectancy; the lack of relationship between pleural plaques and development of any cancer; the history, evolution and knowledge of asbestos-related diseases; and the evolution of the medical communities'
awareness of the increased risks for an asbestos-related disease in the cases of prolonged exposure.

Dr. Kagan, if called to testify, may testify regarding his review of the Plaintiff's(s') and/or Plaintiff's(s') decedent's medical records and diagnosis of the physical condition and relationship, if any, between the Plaintiff's(s') and/or Plaintiff's(s') decedent's exposure to asbestos. He may also testify regarding the immunohistochemical staining process and

results of staining performed on the Plaintiff's(s') and/or Plaintiff's(s') decedent's lung tissue samples, as well as any fiber burden or digestion studies performed.

Dr. Kagan may testify in the area of the medical and scientific aspects of exposure to dust as produced by asbestos-containing products and the development of asbestos-related disease generally. He may testify regarding cause of medical condition and whether the extent to which the Plaintiff's(s') and/or Plaintiff's(s') decedent's particular exposures to asbestos-containing materials caused his/her injury. Dr. Kagan is also expected to testify consistent with his report attached hereto.

**8.** Owens-Illinois reserves the right to call any medical doctor who has prepared a report in this case, any Defense Medical Trust expert, and/or was otherwise disclosed or tendered by another party.

**Other Experts:**

**1.** **Dr. Charles A. Weaver III**; Department of Psychology and Neuroscience Baylor University, Box. 97334; Waco, Texas 76798-7334; (254) 710-6750

Dr. Weaver is an expert in the areas of human memory and cognition. His research interests include memory, the relationship between confidence and memory, eyewitness memory and the effect of misleading information, "flashbulb memory," and repression and the false memory syndrome. Dr. Weaver earned his undergraduate degree from Baylor University in 1984, and obtained his masters and doctorate degrees in Psychology from the University of Colorado, Boulder. Dr. Weaver is a full professor of Psychology and Neuroscience at Baylor University in Waco, Texas, where he has taught since 1989. Dr. Weaver also serves as an associate editor of the Journal of Experimental Psychology: Learning, Memory, and Cognition, and is a member of the Professional and Scientific Advisory Board of the False Memory Syndrome Foundation.

If called to speak to the jury, Dr. Weaver will discuss the nature of memory, recall and retention. He will rely on general principles in the field of psychology and neuroscience and apply them to the factual allegations presented by the Plaintiff(s) and/or Plaintiff's(s') decedent and other fact witnesses. Dr. Weaver will discuss the probability that specific factual information pertaining to a work environment could be retained over a period of two to four decades. He will draw upon his understanding of the physical and biological limitations of memory creation and retention, and the likelihood that after-event stimulus may generate inaccurate or false memories. He will discuss the manner in which "false memories," a term used by psychologists and researchers in the field, can be imprinted and how those memories can rise to the level of an actual memory despite being incorrect. Dr. Weaver will define for the jury in scientific and medical terms human memory, which he describes as a dynamic, creative and reconstructive process. He will discuss memory in terms of "encoding" information, and will describe how memory can be altered by the conditions present when generation or retrieval of memory occurs, for example, due to a leading question presented by an attorney, materials offered to "refresh recollection," or conversations that suggest certain events took place that were unknown to the individual whose memory is being generated. Dr. Weaver will discuss how memories can be altered by events which take place or information which is learned after the original circumstances. He will relate how the more a memory is retrieved or rehearsed, the greater the person's

subjective confidence in the accuracy of the memory, but that increased confidence does not necessarily lead to improved memory accuracy. Dr. Weaver will also discuss his laboratory research and discuss his findings, and the results of studies available in the published literature, that support his opinions. Dr. Weaver will also testify consistent with any report prepared in any specific case.

**2.      Lambertus Hesselink, Ph.D.,** CIS-X Building, Rm 325, Stanford University, Stanford, California 94305

Lambertus Hesselink is a professor of Electrical Engineering, and by courtesy, the Applied Physics and Aeronautics and Astronautics Departments at Stanford University. Dr. Hesselink is an expert in optics and light scattering and has considerable expertise in using optical systems and light scattering principles to characterize fluid and flow dynamics. Dr. Hesselink has won numerous scientific awards from scientific and professional societies including the Fulbright Scholarship, Sheeman Price Award, DARPA Award, and the NISC award. He is also a member of the Royal Dutch Academy of Arts and Sciences. Dr. Hesselink has been the keynote or invited speaker in over 250 scientific meetings, the organizer of over 70 scientific meetings, has authored more than 400 papers in scientific journals, has over 2000 paper citations, has written over 15 book chapters on optics, data analysis and visualization, optical storage, and image processing, and has been the editor of several scientific publications, including *Applied Optics*, *Applied Scientific Research*, and *IEEE Transaction on Visualization*. Dr. Hesselink is a named inventor in over 85 patents and pending applications covering various aspects of optical data storage, optical processing, nano-optics, holography, and Internet-related technologies. Dr. Hesselink also served as an invited member of the Image Processing Ad Hoc Committee to make recommendations to NASA to solve the imaging problems that plagued the Hubble Space Telescope when it was first launched. NASA ultimately adopted the recommendations of the committee on which Dr. Hesselink served and repaired the telescope in space.

Dr. Hesselink may testify regarding the videos of experiments conducted by Dr. William Longo and Richard Hatfield (studies hereinafter collectively referenced to as "Dr. Longo") involving asbestos-containing products, including the "Tyndall light" portions of those videos and the underlying data on the sizes and morphologies of the asbestos fibers detected in those studies by electron microscopy. Dr. Hesselink will explain the actual physics behind the high intensity, or "Tyndall lighting," used by Dr. Longo to accentuate the dust particulates in the air during his studies. He will also testify regarding the optical system used by Dr. Longo to record his experiments, including its specifications and limitations. He will testify that the individual asbestos fibers that Dr. Longo measures by electron microscopy from air samples taken during his experiments are too small to be seen and recorded by the cameras used by Dr. Longo under his high intensity lighting scheme. He will testify that the amount of light scattered off of the individual asbestos fibers that Dr. Longo measures by electron microscopy from air samples taken during his experiences is too small to be seen and recorded by the cameras used by Dr. Longo. Thus, Dr. Hesselink will testify that none of the individual discrete spots or points of light seen on the videotapes of his experiments result from asbestos fibers of the size that Dr. Longo measures in those experiments. In fact, the discrete spots of light are likely generated by particles or aggregates that are hundreds of microns in size, far larger than the respirable range. Dr. Hesselink will also testify that none of the "fog" or "haze" seen on the videotapes

that he has reviewed results from a "cloud" of asbestos fibers of the size and at the concentration that Dr. Longo measures during his experiments. In short, the optical system utilized by Dr. Longo to record his experiences is too insensitive by orders of magnitude to record the light scattered from asbestos fibers of the size that Dr. Longo measures in his experiments at the concentrations that he reports. Dr. Hesselink will testify that the videotapes of Dr. Longo's experiments do not depict or "visualize" any of the asbestos fibers that he measures from air samples taken during his experiments by electron microscopy.

Dr. Hesselink will also comment on prior representations that Dr. Longo has made regarding what his videotapes depict. He will also comment on a September 8, 2005 letter provided by Dr. Phillip Russell, a business partner of Dr. Longo's, which claims that asbestos fibers that are 0.02 to 0.05 micron in diameter are capable of being visualized under Dr. Longo's Tyndall lighting set-up. Dr. Hesselink will testify that both Dr. Longo's claims regarding the capability of his videos to depict respirable asbestos fibers that he counts on his filters and Dr. Russell's claims in his September 8, 2005 letter are incorrect.

**3.    William A. Lowell**, 45 Sixth Avenue, Augusta, ME, 04330.

Mr. Lowell will testify in the cases involving asbestos exposure in, around, or on naval vessels. His opinions will be based on his review of the discovery in each case, on his review of documents related to the ships at issue, including documents obtained from the National Archives, and on his background and experience. Mr. Lowell may testify regarding the industrial hygiene practices employed by the United States Navy, the information relating to asbestos health effects known to him, the use and installation of insulation products on U.S. Naval vessels and specifically about the presence or absence of Owens-Illinois products on said ships.

William Lowell graduated from Maine Maritime Academy in 1956 with a degree in Marine Engineering. Upon graduation, he received an Ensign's Commission in the U.S. Naval Reserve and an unlimited Third Engineer's License for the Merchant Marine allowing him to sail on any steam or diesel ship of any horse power. He obtained an unlimited Chief Engineer's License in 1964 and continues to hold that valid license today. He served for 31 years in the U.S. Naval Reserves as a naval engineer and retired as a Captain. He worked at the Bath Iron Works (BIW) Shipyard for 33 years and retired as General Manager of BIW's Ship Repair Yard in Portland, Maine, in 1995. BIW is a large ship building company at which hundreds of Navy and commercial ships have been constructed and repaired. Through his experience, education and management positions in the shipbuilding industry, he is familiar with plans, designs, and specifications used in the construction of commercial and navy vessels, as well as the actual planning, design, construction, repair, and operation of these vessels. He is familiar with navy manuals, specifications, qualified products lists, departure reports, deck logs, and other documents routinely used in the design, construction, repair, and operation of Navy and other ships. He is also familiar with the historical documents, records and correspondence that are applicable to the construction of commercial and Navy ships and the shipyards that built and repaired those ships.

Throughout his career, Mr. Lowell has been a member of many professional societies. For the past 25 years, he has been, and continues to be, a member of the Society of Naval Architects and Marine Engineers. While employed at BIW, he was member of the

American Society of Naval Engineers and a member of the American Bureau of Ships Engineering Committee that wrote and approved ship building regulations for commercial ships.

**Other Witnesses:**

Owens-Illinois discloses the following individuals as potential witnesses:

1.    Owens-Illinois reserves the right to supplement its disclosure of witnesses up to the time of trial.

2.    Owens-Illinois reserves the right to call any Rule 26 witness disclosed by any other party.

3.    Owens-Illinois discloses all witnesses named, disclosed, and tendered as part of any Defense Medical Trust.


## RESERVATIONS

Owens-Illinois reserves the right to supplement or amend this Disclosure to the extent that discovery of experts and fact witnesses disclosed by the Plaintiff(s) have not been completed. The failure to complete said discovery is not due to any fault or lack of diligence on the part of Owens-Illinois, but rather is due to the constraints imposed by a very tight scheduling Order, approaching trial dates, the scope of the expert's purported expertise, and unavailability of experts for deposition.

Because discovery is ongoing, the need for additional expert testimony may arise in order to rebut the facts and opinions to which the Plaintiff's(s') experts may testify. Owens-Illinois will supplement its disclosures in accordance with Rule 26.

Owens-Illinois reserves the right to call expert opinion and fact witnesses who may be listed by codefendants or the Plaintiff(s) to the extent that testimony is favorable to Owens-Illinois. Owens-Illinois adopts the witness lists and expert witness disclosure of all codefendants. Owens-Illinois also hereby reserves the right to call those expert witnesses listed by the Plaintiff(s).

Owens-Illinois further reserves the right to call as witnesses any individuals necessary to authenticate social security records, tax records, military records, union records, personnel records, sales/shipment/delivery records, or medical records.

Dated:  July 15, 2011                    SCHIFF HARDIN LLP


                                 By:     s/ Edward Casmere
                                         Edward Casmere
                                         Attorney for Defendant
                                         OWENS-ILLINOIS, INC.
                                         6600 Sears Tower
                                         Chicago, Illinois 60606-6473
                                         Phone:  (312) 258-5500
                                         Facsimile:  (312) 258-5600

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on July 15, 2011 he served Owens-

Illinois, Inc.'s Rule 26 Disclosures and Designations of Prior Testimony via email and U.S. Mail

to:

> Michael P. Cascino
> Cascino Vaughan Law Offices, Ltd.
> 220 South Ashland Avenue
> Chicago, IL 60607

DATED: July 15, 2011

s/ Edward Casmere
_____
Robert H. Riley
Matthew J. Fischer
Edward Casmere
Attorney for Defendant
OWENS-ILLINOIS, INC.

Schiff Hardin LLP
233 South Wacker Drive
Chicago, Illinois 60606
(312) 258-5500
(312) 258-5600 (*facsimile*)

**EXHIBIT A**

**Designations of Deposition Testimony of Willis Hazard from February 11, 1981**

| From | | To | |
|---|---|---|---|
| **Page** | **Line** | **Page** | **Line** |
| 14 | 19 | 17 | 16 |
| 17 | 22 | 18 | 5 |
| 19 | 4 | 19 | 10 |
| 19 | 15 | 20 | 5 |
| 21 | 3 | 22 | 12 |
| 30 | 15 | 31 | 10 |
| 32 | 3 | 35 | 15 |
| 36 | 22 | 37 | 10 |
| 38 | 1 | 38 | 7 |
| 38 | 21 | 39 | 9 |
| 39 | 15 | 40 | 5 |
| 40 | 21 | 41 | 19 |
| 42 | 8 | 42 | 15 |
| 49 | 1 | 49 | 3 |
| 49 | 18 | 50 | 15 |
| 52 | 5 | 53 | 21 |
| 54 | 19 | 57 | 13 |
| 59 | 18 | 60 | 18 |
| 61 | 1 | 63 | 9 |
| 72 | 19 | 73 | 22 |
| 79 | 8 | 79 | 20 |
| 80 | 15 | 80 | 21 |
| 81 | 5 | 82 | 3 |
| 82 | 17 | 83 | 6 |
| 84 | 17 | 84 | 20 |
| 84 | 22 | 85 | 4 |
| 85 | 14 | 89 | 8 |
| 89 | 18 | 90 | 23 |
| 100 | 6 | 105 | 4 |
| 106 | 20 | 115 | 19 |
| 116 | 1 | 118 | 13 |
| 118 | 22 | 127 | 4 |
| 127 | 13 | 127 | 15 |
| 127 | 18 | 128 | 3 |
| 128 | 8 | 128 | 11 |
| 135 | 20 | 138 | 1 |
| 147 | 16 | 150 | 9 |

**Designations of Trial Testimony of Richard F. Grimmie from November 26, 1996**

| From | | To | |
|------|------|------|------|
| Page | Line | Page | Line |
| 23 | 24 | 44 | 2 |
| 45 | 6 | 48 | 19 |
| 49 | 6 | 54 | 7 |
| 54 | 13 | 56 | 9 |
| 57 | 11 | 60 | 2 |
| 60 | 10 | 75 | 18 |
| 126 | 18 | 127 | 19 |
| 164 | 1 | 164 | 10 |

CH2\10191745.1